**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION**

ARCH BRADLEY                                                                                           PLAINTIFF

v.                                          No. 4:04CV00567 JLH

LARRY K. JAMES, Individually and in His
Official Capacity as an Employee of the
University of Central Arkansas; and
UNIVERSITY OF CENTRAL ARKANSAS                                                  DEFENDANTS

**OPINION AND ORDER**

This action arises out of the termination of Arch Bradley, formerly an officer of the University of Central Arkansas Police Department ("UCAPD"). Bradley filed suit against the University of Central Arkansas ("UCA") and Larry James, the Chief of Police of the UCAPD ("Chief James"), alleging that, by terminating him, they violated his rights under the First Amendment, the Fourteenth Amendment, the Age Discrimination in Employment Act of 1967, and state law. Chief James and UCA moved for summary judgment on all claims. Without opposition, the Court grants summary judgment on the age discrimination claim and the claims against UCA.[1] The sole remaining claim is the First Amendment retaliation claim against Chief James in his individual and official capacities. For the following reasons, the Court GRANTS summary judgment on this claim.

---

[1] Bradley brings his First and Fourteenth Amendment claims under 42 U.S.C. § 1983, which holds liable, "[e]very person who, under color of [state law] . . . subjects . . . any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution." In response to this motion, Bradley conceded that the University of Central Arkansas is not a "person" for purposes of § 1983 and stated that he no longer wished to proceed with the age discrimination claim. Bradley stated that he was proceeding only with the First Amendment retaliation claim.

**I.**

The UCAPD employs approximately 18 patrol officers. At the time of his termination, Bradley held the position of Captain and Commander of the Patrol Services Division, the third-highest ranking officer in the UCAPD, under Major Glen Stacks, the Deputy Chief of Police, and Chief James, the Chief of Police at the UCAPD. As Commander of Patrol Services, Bradley had primary responsibility over day-to-day command and management of the Patrol Services Division and senior officer authority over all patrol and field operations.

The events giving rise to Bradley's termination began on February 6, 2004. That night, while Bradley and six other officers were on duty, the UCAPD received a call alerting them that someone with a large black hand gun had been seen in one of the dormitories on campus, Hughes Hall. By all accounts, the call was serious. The six UCA officers other than Bradley responded, as did a number of Conway Police Department officers, including four members of the Conway Special Weapons and Tactics Team. Bradley remained at the station and monitored the situation over the radio. With guns drawn, the officers secured the entrances and exits, cleared the building, conducted an active gunmen search, and ultimately, found the gunmen. The gunmen turned out to be two residents chasing each other through the dormitory halls with BB guns.

Chief James was not on duty the night of the incident. Dr. John Smith, the former acting president of UCA, alerted him to the situation when he called Chief James at home and asked what was happening at Hughes Hall. Apparently, Dr. Smith's son, a resident of Hughes Hall, had called his father during the search and informed him that officers were running through the dormitory with automatic weapons. Chief James, in turn, called the station and spoke with Bradley, only to find out that Bradley knew little about the situation. When Chief James arrived at the station, he was visibly

upset. Bradley understood that Chief James was seriously dissatisfied with his response to the incident, despite Bradley's efforts to appease him.

Chief James called Major Stacks later that night and expressed his concerns. He asked Major Stacks to conduct an inquiry regarding the Hughes Hall incident, focusing on into Bradley's inaction, but also addressing the UCAPD's response generally. On Monday, February 9, Major Stacks began his investigation by conducting a debriefing with the officers involved. Based on this session, Major Stacks concluded that no one from the UCAPD had assumed command and control of the situation at Hughes Hall. Major Stacks then contacted Bradley, who had called in sick that day, and arranged to meet him the next day to talk about the incident. On Tuesday, Major Stacks met with Bradley at a restaurant in Conway. At that meeting, Bradley told Major Stacks that Chief James had arrived at the station on the night of the Hughes Hall incident intoxicated and had "taken over" or disrupted the investigation. Bradley also told him that he had tried to contact Jack Gillean, Vice President for Administration and Acting General Counsel about this matter, but failed to reach him. Bradley told Major Stacks that the information was left up to him "to do with it what [he] wanted."

During the meeting, Bradley stated his position on the incident, which was that he did what he believed he was expected to do. Bradley believed that, although the call was serious, his officers were well trained and competent to handle a call of this nature. According to Bradley, Chief James had been pushing a decentralized department and encouraging Bradley to allow the shift commanders to make decisions without assistance unless assistance was requested. Bradley testified that, by the night of the Hughes Hall incident, he was going to the scene of a call only occasionally or when his assistance was requested. His assistance was never requested that night. Bradley emphasized that he told Chief James that night that if Chief James wanted him to respond to calls,

he was fully willing to do that. According to Bradley, however, any expectation to that effect had not been communicated to him.

After the meeting, Major Stacks notified Chief James of Bradley's allegations regarding the intoxication and interference. Chief James ordered Major Stacks to investigate these allegations. Major Stacks also notified Steve Wood, Vice-President of Human Resources at UCA at the time, and advised him of the allegations against Chief James. Wood's understanding of the allegations was that Bradley believed that Chief James "was blowing things out of proportion because he was drinking." At some point, Wood advised Chief James not to participate in the decision-making process regarding these allegations because the issue related to him.

Over the next several days, Major Stacks met individually with the officers involved and asked each whether he had been in contact with Chief James that night and, if so, whether he thought that Chief James was intoxicated. While no officer stated that he thought Chief James was intoxicated or impaired, Officer Sam Turner told Major Stacks that he smelled an intoxicant on the Chief's person and that, in his opinion, Chief James had interfered with the investigation when he first arrived at the department. Trooper Garlington also told Major Stacks that he smelled alcohol on or about Chief James. Each of the officers personally interviewed also expressed dissatisfaction in varying degrees with Bradley's inaction.

On February 18, 2004, Major Stacks met with Bradley regarding the investigation. Bradley stated that he might be willing to retire. Major Stacks then concluded his investigation and made the following relevant findings: (a) that Bradley failed to perform his duties as senior officer on duty during the incident by not being present and taking charge; (b) that several officers were very disappointed with and felt let down by Bradley's failure to take action during the situation; (c) that

4

Bradley's failure to take command of the incident resulted in a lack of coordination between the UCAPD and the Conway Police Department, causing a very dangerous situation for the dormitory residents and the officers involved; and (d) that Bradley's allegation that Chief James had come to the station in an intoxicated state and disrupted the flow of the investigation was totally unfounded.

Major Stacks presented these findings to Wood. They determined that the Hughes Hall incident was extremely serious in light of the fact that it involved drawn guns, a SWAT team, and students climbing out of windows in fear. They also determined that, although Chief James had been drinking, nothing indicated that his judgment was impaired or that there was a problem. It was determined that Bradley's inaction constituted gross misconduct because of the risk involved, the lack of coordination, and the public nature of the incident. Wood and Major Stacks again met with Bradley. On February 27, Wood sent Bradley a letter notifying him that he was subject to termination and offering Bradley the option to retire instead of face termination. The letter informed Bradley that "[his] inaction on February 6th and [his] unsubstantiated comments about Chief James [were] both terminable offenses."

> On March 16, Chief James sent Bradley a termination letter, stating:
>
> I have reviewed the investigative report filed by Maj. Glenn Stacks regarding the events of February 6, 2004, involving an incident in Hughes Hall and your failure or refusal to assume control and command of the Department's response to the incident.
>
> I accept the findings of Maj. Stacks and it is my determination that your inaction during the incident constitutes deliberate or gross neglect of duty. Your inaction during this incident and subsequent unwillingness to accept any substantial responsibility demonstrate an unacceptable indifference to the fundamental mission of the Department and the safety of the university community.
>
> In accordance with provisions of the UCA Staff Handbook, it is my decision to terminate your employment with the University of Central Arkansas, effective immediately.

Bradley subsequently filed suit with this Court. As noted, the sole claim left is a 42 U.S.C. § 1983 claim alleging that Chief James discharged Bradley in violation of the First Amendment.

## II.

A court should enter summary judgment if the evidence, viewed in the light most favorable to the nonmoving party, demonstrates that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S. Ct. 2505, 2511, 91 L. Ed. 2d 202 (1986); *Cheshewalla v. Rand & Son Constr. Co.*, 415 F.3d 847, 850 (8th Cir. 2005). A genuine issue of material fact exists only if there is sufficient evidence to allow a jury to return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 249, 106 S. Ct. at 2511.

## III.

Bradley contends that he was terminated because of the allegations he made against Chief James. Chief James insists that Bradley was not terminated because of these allegations but because of gross neglect of duty for failure to assume control and command on the night of February 6, 2004. Chief James also maintains that, whatever the reason, Bradley's claim fails because his speech was not protected under the First Amendment and because Chief James is entitled to qualified immunity on this claim. As a matter of law, Bradley's speech was not protected by the First Amendment. Therefore, Chief James is entitled to summary judgment both on grounds of qualified immunity and the merits of the claim.

Qualified immunity is an affirmative defense which shields government officials performing discretionary functions from liability for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have

known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982). In ascertaining whether a defendant is entitled to qualified immunity, the Court asks whether the plaintiff has alleged the violation of a constitutional right. *Manzano v. S.D. Dept. of Soc. Servs.*, 60 F.3d 505, 509 (8th Cir. 1995). The Court then determines whether the right was clearly established at the time of the alleged violation. *Id*.

A public employee alleging a violation of his constitutional right to free speech must demonstrate, before all else, that the speech in question is protected under the First Amendment. *Buazard v Meridith*, 172 F.3d 546, 548 (8th Cir. 1999). Speech is entitled to First Amendment protection if it (1) touches on a matter of public concern and (2) the employee's right to free speech outweighs the interests of the public employer "in promoting efficiency of the public services it performs through its employees." *Id*. (citations omitted). These two prongs of the so-called *Connick-Pickering* test are matters of law for the Court to decide. *Sparr v. Ward*, 306 F.3d 589, 594 (8th Cir. 2002) (referring to *Connick v. Myers*, 461 U.S. 138, 103 S. Ct. 1684, 75 L. Ed. 2d 708 (1983), and *Pickering v. Bd. of Educ.*, 391 U.S. 563, 88 S. Ct. 1731, 20 L. Ed. 2d 811 (1968)).

A matter of public concern relates to a matter of political, social or other concern to the community. *Connick*, 461 U.S. at 146, 103 S. Ct. at 1690. Whether speech qualifies as speech on a "matter of public concern," as that phrase is used in the First Amendment setting, is determined by "the content, form and context of a given statement, as revealed by the whole record." *Id*. at 147-148, 103 S. Ct. at 1690.

Four opinions of the Eighth Circuit control this case: *Bausworth v. Hazelwood School District*, 986 F.2d 1197 (8th Cir. 1993); *Day v. Johnson*, 119 F.3d 650 (8th Cir. 1997); *Buazard*, 172 F.3d 546; and *Sparr*, 306 F.3d 589. In each of these cases, the Eighth Circuit held that speech is not

protected by the First Amendment when the employee speaks primarily as an employee and not as a concerned citizen. *Bausworth*, 986 F.2d at 1199; *Day*, 119 F.3d at 657; *Buazard*, 172 F.3d at 549; *Sparr*, 306 F.3d at 595. The emphasis, as demonstrated by these cases, is on the role of the employee in speaking rather than on the public's interest in the speech's topic. *Bausworth*, 986 F.2d at 1198; *Day*, 119 F.3d at 657; *Buazard*, 172 F.3d at 548; *Sparr*, 306 F.3d at 594. When speech is strictly job-related, it will not be considered a matter of public concern. *Buazard*, 172 F.3d at 548; *Sparr*, 306 F.3d at 594. In other words, "unless the employee is speaking as a concerned citizen, and not just as an employee, the speech does not fall under the protection of the First Amendment." *Buazard*, 172 F.3d at 548; *Sparr*, 306 F.3d at 594. "It is not enough that the topic of an employee's speech is one in which the public might have an interest." *Sparr*, 306 F.3d at 594. The relevant inquiry is whether the purpose of the speech was to raise issues of public concern, or, in the alternative, to further the private interests of the employee. *Id*. "Absent highly unusual circumstances, a federal court is not the appropriate forum for reviewing a public employer's reaction to an employee's speech when the employee did not speak as a citizen on a matter of public concern." *Bausworth*, 986 F.2d at 1199.

Bradley contends that the speech at issue in this case involved allegations that Chief James had been "drinking" on the night of the Hughes Hall incident and thus interrupted the investigation.[2] While the record allows a conclusion that Bradley did so allege, *see e.g.*, Bradley Dep. 70, it does not allow the conclusion that the speech was thus constrained. *See e.g.*, Bradley Dep. 72-73. Bradley admits that he "told Major Stacks that he had tried to contact Jack Gillean to inform him that

---

[2] It is undisputed that Chief James had consumed some amount of alcohol at home before he was called by Dr. Smith.

Chief James had come into the station *intoxicated* and disrupted the flow of the investigation on the night of the Hughes Hall incident." Pl.'s Resp. D.'s Stmt. Undisputed Facts ¶ 66 (emphasis added). In any event, any dispute over this fact is immaterial.  The defendants argue that because Major Stacks concluded that Bradley's allegation of intoxication was "completely unfounded" the public's concern with this speech was somehow minimized.[3]  However, even assuming that the allegation that Chief James was intoxicated was true, the record does not support the conclusion that Bradley spoke on a matter of public concern.

The undisputed evidence shows that Bradley spoke as an employee, not as a citizen. Although the allegations against Chief James might have interested the public, no evidence suggests that Bradley acted in his capacity as a citizen when he alleged to Major Stacks that Chief James was intoxicated and interfered with the investigation.  Bradley knew that Major Stacks was conducting an investigation into the Hughes Hall incident; that is to say, he knew that the Tuesday meeting scheduled by Major Stacks was in relation to that night.  Bradley knew that Chief James was gravely dissatisfied with his response to the Hughes Hall incident.  With these circumstances as context, the form and content of the speech demonstrate that Bradley spoke as an employee who was driven by an interest in the outcome of the investigation underway.  *Cf. Sparr*, 306 F.3d at 595.  Bradley spoke on matters that, if believed, could have had some impact on the investigation.  Tellingly, Bradley raised these matters to the two people most closely involved in the investigation: Major Stacks, who bore the initial responsibility to investigate, and Wood, who joined in a consulting role after Bradley raised the allegations against Chief James.  Bradley never raised these matters outside of the context

---

[3] If this were the case, an allegation that Chief James was drinking, the truth of which is admitted, might be treated differently than an allegation that he was intoxicated, the truth or falsity of which is assumably disputed.

of the investigation. He may have attempted to contact Jack Gillean prior to meeting with Major Stacks, but he admittedly never spoke to Gillean and nothing in the record suggests that he persisted in his attempts to reach Gillean after speaking with Major Stacks. Moreover, Bradley left it to Major Stacks to do with the allegations whatever he wanted. Although Bradley testified that "it was an important thing, and I wanted it told, and I wanted something done about it," Bradley made no formal complaint and entrusted the matter entirely to his superior.

Bradley argues, correctly, that he *did* speak to matters of some importance to the public and the First Amendment *does* protect some private and self-serving speech. However, the Court is bound to apply Eighth Circuit precedent to the facts of this case. As instructed by the Eighth Circuit in the cases cited above, the Court must determine if Bradley spoke primarily as a citizen or an employee. *See e.g.*, *Buazard*, 172 F.3d at 548. The context, form, and content of the speech show that Bradley spoke primarily as an employee. Because Bradley did not speak on a matter of public concern, the Court need not proceed to address the balance of interests at play in this case nor the reasons for Bradley's discharge. Bradley's speech is not protected under the First Amendment. Chief James is thus entitled to summary judgment on the merits of this claim and on grounds of qualified immunity.

## CONCLUSION

For the reasons contained in this opinion and order, the Court grants summary judgment in its entirety in favor of UCA and Chief James in his individual and official capacities. Document #21. Judgment will be entered in favor of the defendants.

IT IS SO ORDERED this 20th day of March, 2006.

_____
J. LEON HOLMES
UNITED STATES DISTRICT JUDGE